# Illinois Official Reports

## Appellate Court

---

### *People v. Spain*, 2019 IL App (1st) 163184

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVEN SPAIN, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-16-3184 |
| Filed | December 27, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CR-2276; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Maggie A. Heim, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.<br>Justice Griffin concurred in the judgment and opinion.<br>Justice Walker dissented, with opinion. |

**OPINION**

¶ 1    Following a stipulated bench trial, defendant Steven Spain was found guilty of aggravated unlawful use of a weapon (AUUW) for possessing a concealed and loaded handgun with no valid Firearm Owner's Identification (FOID) card (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2014)) or concealed carry license (*id.* § 24-1.6(a)(1), (a)(3)(A-5)). Mr. Spain received the statutory minimum sentence of one year in prison. The trial court had earlier denied Mr. Spain's motion to quash his arrest and suppress evidence, agreeing with the State that the arresting officers had both a reasonable suspicion of illegal activity to detain Mr. Spain for questioning and probable cause to arrest him and seize the firearm. Mr. Spain now challenges that ruling. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    At a suppression hearing held on May 17, 2016, Mr. Spain called Officer Michael O'Connor, an 11-year veteran of the Chicago Police Department and a member of its gang enforcement unit since 2009. Officer O'Connor testified that, on the afternoon of January 27, 2016, he and his partners, Officers Pouzlp and Perez, were on plainclothes patrol in an unmarked police vehicle, with Officer O'Connor seated in the vehicle's front passenger seat. Although not in full uniform, Officer O'Connor was wearing a vest with a police insignia and his service belt, which held his weapon, handcuffs, and radio.

¶ 4    The three officers arrived at 718 West 48th Street in Chicago in response to an anonymous call regarding "a man with a gun," described to them as "a male Hispanic with tattoos on his face." There they saw, according to Officer O'Connor, "five male Hispanics and one male white"—Officer O'Connor identified the latter as Mr. Spain—standing in the front yard of an abandoned residential building. Just before Officer O'Connor exited the vehicle, he observed Mr. Spain, from a distance of between 10 and 14 feet, "turn toward the fence in the area and try to stuff a large black object down his pants consisting of a gun handle."

¶ 5    Officer O'Connor approached Mr. Spain and told him to put his hands in the air. According to the officer, Mr. Spain "complied for a second," but then "[l]ooking nervously he kept attempting to put his hand back in his pocket." Officer O'Connor, now a foot or two away, again told Mr. Spain to put his hands in the air. He then had Mr. Spain put his hands down on a nearby vehicle and performed a patdown. Feeling what he believed to be the weapon whose handle he had seen, Officer O'Connor asked one of the other officers at the scene to retrieve it from where it had begun to fall into Mr. Spain's pant leg. The recovered weapon was a "black .38 Special handgun with a five-inch barrel [and] six shots loaded." Officer O'Connor then immediately placed Mr. Spain under arrest.

¶ 6    Officer O'Connor acknowledged that, when he made the arrest, he did not yet know Mr. Spain's name and had not checked to see whether Mr. Spain had a valid FOID card or concealed carry license. Aside from observing that Mr. Spain appeared to be in possession of the gun in a public place (unlawful without a valid FOID card or concealed carry license (430 ILCS 65/2(a)(1), (c-5) (West 2016))) and that the gun was partially concealed (unlawful without a concealed carry license (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2014); 430 ILCS 66/10(c)(1) (West 2014))), Officer O'Connor had not seen Mr. Spain violate any local, state, or federal law.

¶ 7        On cross-examination by the State, Officer O'Connor explained that he was familiar with local gang activity. The 700 West block of 48th Street is territory of the Satan Disciples, a street gang that was then "at war" with the Insane Deuces of Canaryville. On the afternoon that this all occurred, in addition to the anonymous tip about a man with a gun, there was an officer safety alert in place, based on a tip that the Insane Deuces were, according to Officer O'Connor, "planning to shoot up the address of 720 West 48th Street because a high-ranking member of the Satan Disciples was known to live in that building." The yard of the abandoned building, where Mr. Spain and the five individuals he was with were seen standing, was immediately adjacent to the address identified in the officer safety alert.

¶ 8        Nothing obstructed Officer O'Connor's view when he saw Mr. Spain conceal what he believed was a handgun in his pants. According to the officer, Mr. Spain looked nervous when the police vehicle arrived on the scene and "really nervous" when he was asked to put his hands up. When he conducted the pat down, Officer O'Connor knew the object that he felt near Mr. Spain's waistband was a gun because it felt just like the revolver the officer himself carried.

¶ 9        Based on this testimony, defense counsel urged the trial court to find that the officers, who lacked any information regarding whether Mr. Spain possessed a valid concealed carry license, did not have the requisite reasonable suspicion of criminal activity to detain and search him, let alone probable cause to arrest him and seize the gun as evidence. Pointing out that Mr. Spain did not run away, did not throw anything, and complied with the officers' orders, defense counsel insisted that the officers could not have reasonably inferred from Mr. Spain's behavior that he lacked proper documentation for the weapon or intended to remove or fire it.

¶ 10       Noting that it found Officer O'Connor to be, "without qualification," a credible witness, the trial court first concluded that, "[i]n connection with [the] gang activity or no," having seen Mr. Spain hide a gun from the officers in the waistband of his pants, Officer O'Connor had "every reason *** to do a *Terry* stop," including a protective pat down for officer safety. See *Terry v. Ohio*, 392 U.S. 1 (1968). The court nevertheless felt compelled by this court's decision in *People v. Holmes*, 2015 IL App (1st) 141256—which had not yet been reversed by our supreme court (*People v. Holmes*, 2017 IL 120407)—to grant Mr. Spain's motion to suppress, on the basis that the officers, having made no effort to determine if Mr. Spain possessed a concealed carry license, lacked probable cause to arrest him and seize the gun. In *Holmes*, this court held that a motion to quash arrest and suppress evidence was properly granted where probable cause was based on the defendant's mere possession of a firearm, under a portion of the AUUW statute later declared unconstitutional in *People v. Aguilar*, 2013 IL 112116. *Holmes*, 2015 IL App (1st) 141256, ¶ 38. Our supreme court, however, held that if probable cause existed at the time of arrest, it would not be retroactively eliminated by the holding in *Aguilar*. *Holmes*, 2015 IL App (1st) 141256, ¶¶ 39-40.

¶ 11       The State in this case moved the trial court to reconsider, arguing that because Mr. Spain was arrested after *Aguilar* and the State in his case never claimed that the mere possession of a gun could establish probable cause, the appellate court decision in *Holmes* was not controlling. The State's position in this case was that, because of Mr. Spain's "nervous demeanor and constant attempt to put his hands in his pants, after Officer O'Connor ordered him numerous times to put his hands up," the officers had probable cause to believe Mr. Spain was not merely carrying a gun but was doing so without the requisite FOID card or concealed carry license—offenses that were not affected by *Aguilar*. As the assistant state's attorney

argued, "[i]t just doesn't make sense *** that he would be trying to hide something that he could legally carry."

¶ 12   Defense counsel countered that people are often nervous around police officers, whether or not they have committed a crime, and it is a simple matter for officers to ask a suspect for necessary documentation before making an arrest.

¶ 13   The trial court granted the State's motion to reconsider. The trial judge wondered why anyone who had gone through the onerous process of obtaining a concealed carry license should not be expected to voluntarily provide it to officers if stopped and questioned. In the absence of such a voluntary disclosure, the court asked, "couldn't [a] reasonable police officer conclude[,] not as a matter of proof beyond a reasonable doubt, but as probable cause, *** that the person probably [didn't] have [the required documentation]?" Defense counsel argued that a finding of probable cause based on a suspect's failure to volunteer information would "be putting the burden on everyone to ensure that officer's [*sic*] are making lawful arrests" when "it's the officer's duty to make lawful arrests." The trial court rejected this argument.

¶ 14   The trial court acknowledged that the Firearm Concealed Carry Act (Concealed Carry Act or Act) (430 ILCS 66/1 *et seq.* (West 2014))—which had not yet been enacted when the defendant in *Holmes* was arrested, but which took effect before Mr. Spain's arrest—only requires individuals to present their concealed carry licenses to law enforcement when asked to do so (*id.* § 10(h)). Nevertheless, the court concluded that Mr. Spain's failure to voluntarily produce such a license in this case gave the officers probable cause to conclude that his possession of the gun was unlawful.

¶ 15   Mr. Spain waived his right to a jury trial. At the bench trial, the parties stipulated to the admissibility of Officer O'Connor's testimony at the suppression hearing. The parties further stipulated that (1) if called to testify, Officers Salgado and Pouzlp would provide chain-of-custody testimony for the weapon and (2) on the day in question, Mr. Spain did not have a valid FOID card or concealed carry license. Finally, the court heard argument on whether the State had proved beyond a reasonable doubt that the residential property where Mr. Spain was arrested was in fact abandoned, since if it was land or a legal dwelling place where Mr. Spain was entitled to be as an invitee, he could not be found guilty of AUUW.

¶ 16   Mr. Spain was found guilty of three counts of AUUW. The trial court merged the counts, and, because Mr. Spain had no prior felony record, sentenced him to the statutory minimum sentence of one year in prison. The court denied Mr. Spain's motion for a new trial.

¶ 17                                    II. JURISDICTION

¶ 18   Mr. Spain was sentenced on November 14, 2016, and filed his notice of appeal the same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Dec. 11, 2014), governing appeals from final judgments of conviction in criminal cases.

¶ 19                                     III. ANALYSIS

¶ 20   On appeal, Mr. Spain challenges the trial court's denial of his motion to quash his arrest and suppress evidence. While the parties focused their arguments in the trial court on whether there was probable cause to arrest, on appeal they concentrate almost exclusively on whether

a reasonable suspicion of criminal activity justified the initial *Terry* stop. In our view, both questions must be considered. Each involves a separate analysis, and our answer to each has different implications. Officer O'Connor certainly needed a reasonable suspicion of criminal activity before he could stop Mr. Spain for questioning and pat him down for weapons. And if that investigative stop was not justified, it would be appropriate to suppress the gun and any testimony regarding the gun as fruit of the poisonous tree. But, even if the *Terry* stop was justified, Officer O'Connor was required to have probable cause before arresting Mr. Spain or seizing the gun as evidence. If there was no probable cause, Mr. Spain was free to leave after the investigative stop and the gun should have been returned to him. 725 ILCS 5/108-1.01 (West 2014).

¶ 21   For the reasons that follow, we find both that there was a sufficient basis for a *Terry* stop and, based on what occurred during that permissible stop, that Officer O'Connor had probable cause to arrest Mr. Spain and to seize his gun.

¶ 22   The right to be free from unreasonable searches and seizures is protected by both the United States and Illinois Constitutions. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Underlying this right is a desire to balance society's interest in protecting citizens from "rash and unreasonable interferences with [their] privacy," against its interest in providing officers "fair leeway for enforcing the law in the community's protection." (Internal quotation marks omitted.) *People v. James*, 163 Ill. 2d 302, 311 (1994). Subject to only a few exceptions, a warrantless search or seizure conducted outside of the judicial process is *per se* unreasonable. *People v. LeFlore*, 2015 IL 116799, ¶ 17.

¶ 23   One of those exceptions is an investigative "*Terry* stop." In *Terry*, 392 U.S. at 30, the United States Supreme Court held that a police officer may stop an individual for temporary questioning where the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." In Illinois, this requirement is codified in section 107-14 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/107-14 (West 2014)). To initiate a *Terry* stop, an officer must have "more than an inarticulate hunch"; he or she "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." (Internal quotation marks omitted.) *People v. Colyar*, 2013 IL 111835, ¶ 40. In assessing whether a *Terry* stop was justified, the facts must be considered, not "with analytical hindsight" but "from the perspective of a reasonable officer at the time that the situation confronted him or her." *People v. Thomas*, 198 Ill. 2d 103, 110 (2001). Once a stop is initiated, if the officer justifiably believes that the individual whose suspicious behavior he or she is investigating at close range is armed and dangerous, the officer also may conduct a pat down search for a weapon. *Terry*, 392 U.S. at 24; *People v. Sorenson*, 196 Ill. 2d 425 (2001). If a weapon is found, the officer may confiscate it "until the completion of the questioning," at which time he or she must "either return [it], if lawfully possessed, or arrest the person so questioned." 725 ILCS 5/108-1.01 (West 2014).

¶ 24   Probable cause—which is something more than a mere suspicion of criminal activity (*People v. Culbertson*, 305 Ill. App. 3d 1015, 1024 (1999))—is needed for an officer to make a warrantless arrest. *People v. Brannon*, 308 Ill. App. 3d 501, 504 (1999). "[T]he existence of probable cause depends upon the totality of the circumstances at the time of the arrest." (Internal quotation marks omitted.) *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009). The facts known to the officer must be "sufficient to lead a reasonably cautious person to believe that

the arrestee has committed a crime." (Internal quotation marks omitted.) *Id.* Although it is a more demanding standard than the reasonable suspicion of criminal activity needed to initiate an investigative stop (*Alabama v. White*, 496 U.S. 325, 330 (1990)), probable cause " 'does not deal with hard certainties, but with probabilities' " (*Illinois v. Gates*, 462 U.S. 213, 231-32 (1983) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981))). These probabilities are " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232.

¶ 25    Incident to a lawful arrest, an officer may search the person arrested "and the area within such person's immediate presence" and may seize "any instruments, articles, or things which may have been used in the commission of, or which may constitute evidence of, an offense." 725 ILCS 5/108-1(1)(d) (West 2014). But as section 108-1.01 of the Code and the case law make clear, if the information that officers gather during an investigative stop does not give rise to probable cause, they must return any item—even a weapon—found during the stop. *Id.*; see also 4 Wayne R. LaFave, Search and Seizure § 9.6(d) (5th ed. 2012) (noting that where an investigative stop is justified but does not give rise to probable cause, an "officer is entitled to retain even an object which could be used as a weapon only until such time as the seizure of the suspect is terminated"); *People v. Raibley*, 338 Ill. App. 3d 692, 700 (2003) (noting that an item discovered during a lawful search may be seized only if police "have probable cause to believe it is contraband or evidence of a crime," and "[t]he incriminating character of the item [is] immediately apparent at the time of the seizure").

¶ 26    The burden of proving that a search and seizure was unlawful is on the defendant. 725 ILCS 5/114-12(b) (West 2014). "If the defendant makes a *prima facie* case that *** evidence was obtained through an illegal search, then the State can counter with its own evidence" that the search was lawful. *People v. Lampitok*, 207 Ill. 2d 231, 239 (2003). If a search and seizure is deemed unlawful, section 114-12(b) of the Code provides that "the property shall be restored" and, "unless otherwise subject to lawful detention, *** shall not be admissible in evidence against the movant at any trial." 725 ILCS 5/114-12(b) (West 2014). This is a codification of the judicially created exclusionary rule, pursuant to which the State is precluded from using "the fruits of a past unlawful search or seizure" at trial where this will serve to deter future fourth amendment violations. *Arizona v. Evans*, 514 U.S. 1, 10-11 (1995).

¶ 27    A trial court's ruling on a motion to suppress evidence is subject to a dual standard of review. *People v. Johnson*, 237 Ill. 2d 81, 88 (2010) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). We defer to the court's factual findings and credibility determinations, disregarding them only where they are against the manifest weight of the evidence. *Id.* But we review *de novo* the trial court's ultimate determinations regarding the existence of reasonable suspicion or probable cause and its application of the exclusionary rule. *People v. McDonough*, 239 Ill. 2d 260, 266 (2010); *People v. Carlson*, 185 Ill. 2d 546, 551 (1999).

¶ 28    Mr. Spain was arrested for possessing an uncased, loaded, and immediately accessible partially concealed weapon in a public place. As the defense stresses, since our supreme court struck down a section of the AAUW statute that categorically prohibited the possession of an operable firearm outside the home as unconstitutional in *Aguilar*, 2013 IL 112116, ¶ 22, possession of a loaded gun in public is not necessarily unlawful. However, possession of an

uncased, loaded, and immediately accessible weapon in a public place is still unlawful unless that weapon is fully or partially concealed and the person in possession of that weapon has been issued a concealed carry license. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2014); 430 ILCS 66/10(c)(1) (West 2014)).

¶ 29        A concealed carry license is issued only to persons who have applied, paid a licensing fee, been approved by the Department of State Police, and meet certain criteria, which include but are not limited to being at least 21 years of age, having a currently valid FOID card, not having been convicted in any state of a crime involving the use of physical force or violence within 5 years of applying, and completing firearms training. 430 ILCS 66/10(a) (West 2014) (referencing licensing requirements contained in section 25 of the Act (*id.* § 25)). The Concealed Carry Act also requires that a licensee possess the license at all times that the licensee carries a concealed firearm in public. *Id.* § 10(g).

¶ 30                            A. Reasonable Suspicion to Conduct a *Terry* Stop

¶ 31        Mr. Spain's position on appeal is that, taken together or separately, the circumstances on the afternoon in question did not give rise to a reasonable, articulable suspicion that any criminal activity was afoot. Mr. Spain insists that the officers, having "little more than a suspicion that [Mr. Spain] possessed a firearm"—which is not necessarily a crime—had no right even to stop and question him. We disagree.

¶ 32        Mr. Spain is correct that the uncorroborated anonymous tip concerning "a male Hispanic with tattoos on his face" did not implicate Mr. Spain in any way. Thus, the tip could not have given rise to a "reasonable suspicion" of criminal activity by Mr. Spain. Our supreme court has held that "[a] tip from an anonymous person may supply the requisite quantum of suspicion to conduct a *Terry* stop" only if "the information bears some indicia of reliability." *People v. Henderson*, 2013 IL 114040, ¶ 26. The tip must be reliable not only in its " 'tendency to identify a determinate person,' " but also " 'in its assertion of illegality.' " *Id.* (quoting *Florida v. J.L.*, 529 U.S. 266, 272 (2000)). It must show that the anonymous informant has "inside information" by, for example, "accurately predict[ing] future behavior." (Internal quotation marks omitted.) *Id.* Here, the tip described a person who looked nothing like Mr. Spain.

¶ 33        The officer safety alert, however, warning that members of the Insane Deuces were, in Officer O'Connor's words, "planning to shoot up the address of 720 West 48th Street because a high-ranking member of the Satan Disciples was known to live in that building," is different. While the record does not contain information about the cooperating individual who provided this tip, the tip itself provided specific details—the identities of the two rival gangs, a street address, and a motive—that Officer O'Connor testified were consistent with what he knew about gang territories and behavior in that area. And although the tip did not describe a particular suspect, it alerted officers that multiple armed gang members planned to convene at a specific address. Officer O'Connor and his partners observed a group of six men—including Mr. Spain, who appeared to have a gun handle sticking out of the waistband of his pants—standing in the yard of an abandoned building immediately next door to the address in the officer safety alert.

¶ 34        This background must be considered together with what the officers saw when they arrived on the scene. Officer O'Connor saw Mr. Spain with what appeared to him to be a partially concealed firearm. He also saw Mr. Spain turn away from him toward a fence "and try to stuff a large black object down his pants consisting of a gun handle." Mr. Spain's conduct as the

officers approached was to move his gun from its partially concealed location to a completely concealed position down his pants. This was, in Officer O'Connor's words, "unusual conduct," supporting a *Terry* stop.

¶ 35    Witnessing this, at close range and with an unobstructed view, provided Officer O'Connor with more than a vague "hunch" that Mr. Spain was in illegal possession of a gun; it, together with the other information the officer had, provided him with a reasonable suspicion that Mr. Spain was in possession of a weapon and that illegal gun possession or other criminal activity "may be afoot." We agree with the trial court in this case that the officer's observations of Mr. Spain—together with the officer safety alert and anticipated gang activity—formed a sufficient basis for Officer O'Connor to stop Mr. Spain for the purpose of an investigative stop.

¶ 36                    B. Probable Cause to Arrest and Seize the Gun as Evidence

¶ 37    Mr. Spain was arrested for illegal gun possession, which required the police to have probable cause to believe not only that Mr. Spain was carrying a gun but that he was doing so illegally. The Concealed Carry Act makes clear that once a *Terry* stop has been initiated, an officer may ask an individual found in possession of a concealed or partially concealed gun to produce his or her concealed carry license. 430 ILCS 66/10(h) (West 2016). It is that license that allows an individual to "carry a loaded or unloaded concealed firearm, fully concealed or partially concealed, on or about his or her person." *Id.* § 10(c)(1). The Act requires, with exceptions that are not relevant here, that "[a] licensee shall possess a license at all times the licensee carries a concealed firearm." *Id.* § 10(g). The Act also specifically provides:

> "If an officer of a law enforcement agency initiates an investigative stop, including but not limited to a traffic stop, of a licensee ***, *upon the request of the officer* the licensee *** shall disclose to the officer that he or she is in possession of a concealed firearm under this Act, or present the license *upon the request of the officer* if he or she is a licensee ***." (Emphases added.) *Id.* § 10(h).

¶ 38    The problem here is that the arresting officers did not make any request of Mr. Spain for his concealed carry license. If they had, and he had failed to produce it, there would not be any question as to whether there was probable cause to arrest him. The State contends that the evidence was nonetheless sufficient, after the police engaged in their brief encounter with Mr. Spain, to arrest him. The trial court in this case agreed.

¶ 39    What occurred during this stop was very limited. According to Officer O'Connor, he told Mr. Spain to put up his hands, and Mr. Spain "complied for a second" but then "[l]ooking nervously he kept attempting to put his hand back in his pocket." Officer O'Connor, now one or two feet away, again told Mr. Spain to put his hands in the air. He then had Mr. Spain put his hands down on a nearby vehicle and performed a pat down. Feeling what he believed to be the weapon whose handle he had seen, Officer O'Connor asked one of the other officers at the scene to retrieve it from where it had begun to fall into Mr. Spain's pant leg. The recovered weapon was a "black .38 Special handgun with a five-inch barrel [and] six shots loaded." Officer O'Connor then immediately placed Mr. Spain under arrest.

¶ 40    During this exchange, all that occurred is that Mr. Spain continued to act nervously, kept attempting to put his hands in his pockets, and never indicated to the officers that he was carrying the gun legally. The police were also able to confirm that Mr. Spain was carrying a weapon and that it was loaded. This is not a case like *People v. Thomas*, 2019 IL App (1st) 170474, where police officers approached the defendant in the common area of a multiunit

apartment building and saw him hand off his gun to a friend and flee upstairs into one of the apartments. *Id.* ¶ 1. The friend, finding himself locked out of the apartment, then threw the gun onto the second-stair landing. *Id.* ¶ 6. In this case, Mr. Spain did not flee but stood nervously while the police confirmed that he was carrying a handgun and recovered it from where he had placed in his waistband.

¶ 41 The trial court relied in significant part on the fact that, during this exchange, Mr. Spain did not volunteer to the police that he had a license to carry the gun. While there are valid reasons why an individual approached by police officers might choose to remain silent, even after the police have recovered a gun, we agree that an individual's choice not to volunteer that he has a concealed carry license when a gun is found on his person is an additional factor that police are entitled to take into account when they determine whether there is probable cause to arrest that individual and seize the gun, rather than return it to him, as they would otherwise have been required to do. As the leading commentator on the fourth amendment has noted, the expectation that an innocent person will want to explain otherwise suspicious circumstances is a common-sense notion police may consider when making a probable cause determination. See 4 Wayne R. LaFave, Search and Seizure § 9.6(d) (5th ed. 2012) ("common sense suggests that as a general matter innocent persons confronted with the fact that they are under police suspicion and called upon to clarify the situation will respond with some sort of explanation").

¶ 42 At the same time, we want to reiterate, as this court noted recently in *Thomas*, that an " 'arrest first, determine licensure later' method of police patrol," is not what the Concealed Carry Act contemplates. *Thomas*, 2019 IL App (1st) 170474, ¶ 40. When officers arrest someone found in possession of a gun without first asking whether he or she is legally entitled to be carrying that gun, the police are at significant risk that they are arresting a suspect without the requisite probable cause, such that any fruits of that arrest will be inadmissible in a criminal prosecution. In short, where an officer elevates a *Terry* stop into an arrest, without making the simple request that the Concealed Carry Act contemplates, he or she takes a risk that the arrest may later be quashed, and any resulting evidence suppressed.

¶ 43                                            IV. CONCLUSION

¶ 44 For the above reasons, we affirm the trial court's denial of Mr. Spain's motion to quash his arrest and suppress evidence and we affirm his conviction.

¶ 45 Affirmed.

¶ 46 JUSTICE WALKER, dissenting:

¶ 47 I respectfully dissent.

¶ 48 The majority presents compelling arguments to reverse the trial court. The majority agrees that simply possessing a gun is not a criminal act in itself and that there are "valid reasons why an individual approached by police officers might choose to remain silent." *Supra* ¶ 41. Despite these acknowledgements, the majority rules incorrectly.

¶ 49 Gun possession alone is not enough to create probable cause to arrest, and silence in the face of multiple approaching officers is not unreasonable or inherently suspicious. However, the majority relies on Mr. Spain's silence to find probable cause for his arrest. Even with the attendant circumstances, Mr. Spain's silence is insufficient to have created probable cause

because Illinois law does not require a weapons suspect to volunteer his or her concealed carry license.

¶ 50    The trial judge found that it could be "reasonably conclude[d] that if somebody doesn't volunteer that they have a firearm owner's identification card and certainly a concealed carry license, that the officer could then reasonably conclude that the person did not so as to justify the arrest of the person [and] the seizure of the gun." The trial judge made this finding, in violation of Illinois law. Under the Concealed Carry Act, when an officer initiates an investigatory stop, the licensee is not required to disclose information until the officer makes a request. 430 ILCS 66/10(n) (West 2016). Once the request is made, the licensee shall disclose to the officer that he or she is in possession of a concealed firearm under the Act, present his or her license to the officer, and identify the location of the concealed firearm. 430 ILCS 66/10(h) (West 2016).

¶ 51    There was an officer's safety alert for the area surrounding 720 West 48th Street following a confidential informant's (CI) tip of a planned gang shootout at a nearby address. Then, the officers received an anonymous call of "a man with a gun" described as "a male Hispanic with tattoos on his face." Officer O'Connor, an 11-year veteran with 7 years in gang enforcement, arrived to find Mr. Spain and five Hispanic males standing at 718 West 48th Street. He then noticed what appeared to be the butt of a gun in Mr. Spain's waist band. The anonymous tip, despite being the impetus for the officers' visit, should not be factored into the reasonable suspicion analysis. It had no indicia of reliability, being anonymous and wildly incorrect. Similarly, the State failed to provide any evidence of reliability for the tip from the CI regarding the planned shooting. However, given Officer O'Connor's experience and familiarity with gangs in the area and Mr. Spain possessing a gun next door to the address described as the potential situs for a gang shooting, there were specific articulable facts to justify the investigative stop.

¶ 52    I disagree that there was probable cause for the arrest. The Act only requires the subject of the *Terry* stop to present his or her concealed carry license "upon the request of the officer." 430 ILCS 66/10(h) (West 2016). The Act does not require voluntary disclosure. Here, there was never a request. Expecting someone to volunteer information when confronted by police officers is contrary to both the fourth amendment and the legislative intent, and this court should not impose that burden on citizens.

¶ 53    The trial judge originally made the correct decision at the conclusion of the suppression hearing. The trial judge recognized that the officers made no effort to determine if Mr. Spain possessed a concealed carry license and lacked probable cause to arrest. However, the trial judge reversed himself after the State filed a motion to reconsider. Here, the majority states that "an individual's choice not to volunteer that he has a concealed carry license" is an "additional factor" for the police to determine probable cause. *Supra* ¶ 41. However, it was the sole factor here. Immediately after officers performed the pat down of Mr. Spain and confirmed the existence of the gun, they arrested him. Other than the gun, they knew nothing more about Mr. Spain than they did before they began the *Terry* stop. They did not even know his name at that point. The majority quotes an article that states "common sense suggests that as a general matter innocent persons confronted with the fact that they are under police suspicion and called upon to clarify the situation will respond with some sort of explanation." 4 Wayne R. LaFave, Search and Seizure § 3.6(f) (5th ed. 2012). This notion turns the fifth amendment on its head. Mr. Spain had a right to remain silent and does not have to incriminate himself. The majority's

finding that Mr. Spain must tell the police of his conceal carry is simply not the law of Illinois and may lead this state down a slippery slope. The majority's decision raises serious questions of where to draw the line. Does this mean that every time someone is approached by police, he or she is required to volunteer the use of legal marijuana or alcohol? The law is clear that an individual stopped by police does not have to admit to anything and may remain silent.

¶ 54 The majority notes that if a weapon is found after a pat down, the officer may confiscate it "until the completion of the questioning," at which time he or she must "either return [it], if lawfully possessed, or arrest the person so questioned." *Supra* ¶ 23; 725 ILCS 5/108-1.01 (West 2016). If the police believed Mr. Spain was in illegal possession of a gun, they had a simple and powerful tool within their discretion to eliminate doubt: one single request. I reiterate, the Act allows police officers to request a gun owner's concealed carry license. Upon request, the gun owner is required to furnish the license (430 ILCS 66/10(h) (West 2016)); if the owner is unable to furnish it, the police then have probable cause to arrest. Here, the officers were one question away from a valid arrest. The majority states that the Act does not contemplate an "arrest first, determine licensure later." (Internal quotation marks omitted.) *Supra* ¶ 42. However, the majority's finding in this case goes against the majority's analysis. I would grant Mr. Spain's motion to quash the arrest.

¶ 55 Therefore, I respectfully dissent.