2021 IL App (1st) 170371-U

No. 1-17-0371

Order filed March 25, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois |
| Plaintiff-Appellee, | ) | |
| | ) | |
| vs. | ) | No. 14 CR 22337 |
| | ) | |
| RODRICK LYKE, | ) | Honorable |
| | ) | Gregory Robert Ginex, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Trial court did not err when it denied defendant's motion to quash his arrest and suppress evidence seized from a search of his person as the police had reasonable, articulable suspicion of criminal activity when they detained and subsequently searched defendant. Defendant's conviction was improperly enhanced when the State failed to give proper notice of a prior conviction in the charging document.

¶ 2   Following a bench trial, defendant, Rodrick Lyke[1], was convicted of two counts of aggravated unlawful use of a weapon ("AUUW") and sentenced to a term of three years'

---

[1] The defendant's first name is spelled throughout the record both as Rodrick and Roderick. For purposes of this appeal, the court will adopt the spelling, Rodrick, used by Lyke in his filings.

imprisonment in the Illinois Department of Corrections. On appeal, Lyke contends: (1) the trial court erred in denying his motion to quash arrest and suppress evidence because police officers did not have a reasonable, articulable suspicion of criminal activity at the time they detained and searched him, and (2) his AUUW convictions were improperly enhanced from Class 4 to Class 2 offenses where the trial court improperly relied upon a void conviction.

¶ 3     For the following reasons, we affirm Lyke's convictions for aggravated unlawful use of a weapon, vacate Lyke's sentence, and remand for resentencing as a Class 4 felony.[2]

¶ 4                          I. JURISDICTION

¶ 5     The trial court sentenced Lyke on February 9, 2017, and on that same date, Lyke filed a notice of appeal. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1980, art. VI, §6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case.

¶ 6                          II. BACKGROUND

¶ 7     Lyke was charged by indictment with one count of unlawful use of a weapon by a felon ("UUWF") and two counts of AUUW arising from an incident that occurred in Cook County on December 6, 2014. The UUWF count was based on Lyke's "having been previously convicted of the felony offense of aggravated unlawful use of a weapon, under case number 11 CR 18974." Both AUUW counts announced the State's intention "to sentence Rodrick Lyke as a Class 2 offender in that he has been previously convicted of the offense of aggravated unlawful use of weapon under case number 11 CR 18974."

---

[2] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 8        Prior to trial, Lyke filed a motion to dismiss count one of the indictment, unlawful use of a weapon by a felon. Lyke simultaneously filed a motion to quash arrest and suppress evidence, arguing that his arrest was an unreasonable seizure in violation of the fourth amendment of the United States Constitution (U.S. Const., amend. IV) and that the evidence discovered as a result of his arrest and detention should be suppressed. On January 28, 2016, the trial court heard both of Lyke's motions.

¶ 9                                                   *Pretrial*

¶ 10        At the hearing on the motion to dismiss count one of the indictment, Lyke argued that the felony upon which the charge of UUWF was predicated was void *ab initio* pursuant to *People v. Aguilar*, 2013 IL 112116. The State countered that Lyke had a previous felony conviction for possession of a controlled substance ("PCS"), under case number 10 CR 22343, which could properly have been used as a predicate felony offense. The trial court granted Lyke's motion and dismissed count one, UUWF. The trial court then heard Lyke's motion to quash arrest and suppress evidence. The following evidence was adduced at the suppression hearing.

¶ 11        Bellwood Police Officer Lisa Brennan testified that on the morning of December 6, 2014, she was on patrol when, at approximately 2:30 a.m., she received a radio communication from Bellwood Police Officer Vacari[3]. Officer Vacari indicated to Officer Brennan that he had received information from Thomas Mathis, a bouncer at Ice nightclub ("the nightclub")[4], located in the 2300 block of St. Charles in Bellwood, Cook County, Illinois. Shortly after receiving the radio

---

[3] Officer Vacari's first name was not made a part of the record at the suppression hearing or at trial.
[4] The nightclub in question is interchangeably referred to as "Ice nightclub," "Ice Club," and "Ice House." For purposes of clarity, the location will be referred to as "the nightclub" hereafter.

communication, Officer Brennan arrived at the nightclub, where she observed Bellwood Police Officers Bruno, Baxter,[5] and Ricardo Sarabia already on the scene.

¶ 12    Officer Brennan spoke with Mathis, who relayed that a man—whom he described as a light-skinned individual wearing a tan hat and tan Timberland boots—had attempted to enter the establishment with a gun in his possession. According to Mathis, the man's friends were still in the nightclub and he was therefore likely to return to the area. Mathis apprised Officer Brennan he would signal the police officers if the man, later identified as Lyke, returned to the nightclub. Officer Brennan remained on the scene and Mathis later notified her of Lyke's return.[6] Mathis observed Lyke walking westbound on St. Charles and informed Officer Brennan that Lyke had accidentally brushed into Officer Sarabia. Officer Brennan alerted Officers Bruno and Sarabia that Lyke had been identified as the man who had earlier attempted to enter the nightclub with a gun.

¶ 13    After notifying Officer Bruno, Officer Bruno indicated to Officer Brenan that he had seen Lyke exit a gray BMW on the 2200 block of St. Charles. Officers Brennan and Bruno approached Lyke from behind and Officer Bruno detained him. Officer Brennan informed Lyke that he had been identified as an individual who had earlier attempted to bring a weapon into the nightclub. At this time, Officers Baxter and Sarabia approached Lyke from the front and Officer Brennan inquired if Lyke had a weapon on him. Lyke denied having a weapon. Officers Sarabia and Bruno then attempted a search of Lyke's person. Lyke, however, began tensing his hands and bending at the waist, in an effort to defeat the protective pat down. Officer Brennan heard Officer Sarabia state "gun, gun, gun." When Officer Sarabia lifted Lyke's sweater vest, Officer Brennan observed

---

[5] Neither Officer Bruno's nor Officer Baxter's first names were made a part of the record at the suppression hearing or at trial.

[6] Officer Brennan testified she could not remember how much time had passed between her arrival at the nightclub and Lyke's return, but she estimated it was "more than likely" that less than an hour had elapsed.

the weapon visibly sticking up out of Lyke's waistband. The officers recovered the weapon, a Glock handgun with a 31- round magazine containing 28 live rounds.

¶ 14 Following Officer Brennan's testimony, the defense rested, and the State made a motion for a directed finding. The State argued that, based on the testimony provided, Lyke had not shifted the burden to the State. In support of Lyke's motion to quash arrest and suppress evidence, defense counsel argued that the police officers did not have a sufficient basis to detain Lyke and subject him to a pat down since "all they knew is that a person, an individual, with a general description provided by the bouncer had been identified earlier as having possessed a weapon." Defense counsel further asserted that there was no reason to believe Mathis or his information was reliable and argued that the police officers did not independently corroborate Mathis' stale tip. The trial court granted the motion for directed finding and denied the motion to quash arrest and suppress evidence, finding that the officers had a right to make a Terry stop and would have been "remiss in their duty" if they had not pursued Mathis' tip.

¶ 15 Lyke filed a motion to reconsider the trial court's denial of his motion to quash and suppress. Defense counsel argued two alternative base for reconsideration: (1) Officer Brennan relied solely on Mathis' tip without indicia of reliability or corroboration; and (2) that even if Mathis' tip were considered reliable, the mere fact that Lyke carried a concealed firearm would not alone provide reasonable suspicion to warrant a Terry stop. The trial court denied Lyke's motion to reconsider, finding that (1) the police officers performed a proper Terry stop, and (2) although people are allowed to carry weapons, they are not allowed to enter a club with a gun.

¶ 16 *Trial*

¶ 17 At trial, Officer Brennan testified consistently with her earlier testimony from the suppression hearing. Based upon the radio communication she received on December 6, 2014, she

responded to 2305 St. Charles and spoke with Mathis. Officer Brennan testified that she had previously worked with Mathis approximately 20 to 30 times in her capacity as a police officer. She further clarified that this was the first incident where she had acted on Mathis' information. Following her discussion with Mathis, Officer Brennan began looking for a light-skinned black male wearing a tan hat and tan Timberland boots. While patrolling the area in her vehicle, Officer Bruno related over the radio that Mathis had alerted him that the man had returned to the area.

¶ 18    Officer Brennan returned to the area and parked her vehicle in front of the nightclub. As Officers Brennan and Bruno approached, Mathis pointed out an individual, later identified as Lyke, approximately five to ten feet in front of them. Lyke then bumped into Officer Sarabia and continued walking west. Subsequently, Officers Brennan and Bruno approached Lyke from behind, while Officers Sarabia and Baxter approached from the front. They stopped Lyke and advised him that he was identified as someone who had earlier attempted to enter the club with a weapon. The officers asked Lyke if he had a gun, which he denied. Officers Sarabia and Baxter performed a search while Officer Bruno held Lyke. Lyke began tensing his hands and Officer Brennan advised the other officers to place him in handcuffs for their safety. As the officers continued their search of his person, Lyke bent over at the waist to prevent them from searching his waistband. Officer Bruno repositioned Lyke to expose his waist and Officer Sarabia discovered a gun sticking out of Lyke's waistband. Officers recovered a black .9-millimeter Glock 17 handgun. Officer Brennan read Lyke his *Miranda* rights, and Lyke then spontaneously stated he had just performed and had a weapon. Lyke was transported to the police station.

¶ 19    At the station, Lyke again proffered that he had just finished performing and that was why he had a gun. After spending the night in a holding cell, Lyke was reread his *Miranda* rights the following morning. While Lyke initially declined to speak with officers, he then declared that he

had the gun for a music video and did not intend to hurt anyone. Lyke never provided the police with a Firearm Owner's Identification ("FOID") card or a Concealed Carry License ("CCL").

¶ 20    Former Bellwood Police Officer Ricardo Sarabia testified that on December 6, 2014, he was on patrol at approximately 2:30 a.m. when he received a radio communication about a man with a gun. After arriving at the location, he began foot patrol and observed fellow officers Brennan, Bruno, and Baxter. After speaking with Officer Bruno, Officer Sarabia began looking for a light-skinned black male wearing a tan hat and tan boots. Within a few minutes, Officer Sarabia saw Lyke, who matched the description he had been given. The two men brushed by each other, and Officer Sarabia decided to do a Terry stop search, a "protective for officer safety search." Officer Brennan asked Lyke if he had a weapon, and he answered in the negative.

¶ 21    Officer Sarabia began to perform a search of Lyke's person, and Lyke began tensing his arms and hands and defeated the search by bending forward at the waist. Officer Bruno straightened Lyke out so Officer Sarabia could perform his search. Officer Sarabia lifted the front of Lyke's shirt and found a gun in his waistband. Officer Sarabia yelled out "gun, gun, gun" and secured the black Glock 17, rendering it safe. The gun was fully loaded, with a round in the chamber and rounds in the magazine. Officer Brennan advised Lyke of his *Miranda* rights. Officer Sarabia transported Lyke to the police station, where Lyke stated he had the gun because he was shooting a rap video.

¶ 22    The State entered into evidence (1) a certified copy of conviction under case 11 CR 18974 for unlawful use of a weapon, and (2) an Illinois State Police certification that Lyke had never been issued a FOID card or a CCL. The trial court denied a motion for directed verdict, and defense counsel renewed Lyke's motion to reconsider the denial of the motion to quash and suppress. The trial court again denied the motion. Following closing arguments, the court found Lyke guilty of

both counts of AUUW. Thereafter, Lyke filed a motion for new trial, an amended motion for new trial, and a second amended motion for a new trial. The court denied Lyke's second amended motion for a new trial.

¶ 23      At the sentencing hearing, defense counsel advised the court that Lyke's 2011 conviction for AUUW was vacated in January of 2017. The court assured the parties that it would not take Lyke's vacated conviction into consideration. In response, the State informed the court that Lyke had a 2010 PCS conviction. After listening to arguments in mitigation and aggravation, the court sentenced Lyke on Count 2 to a Class 2 sentence of three years' imprisonment in the Illinois Department of Corrections.

¶ 24                                    III. ANALYSIS

¶ 25      On this direct appeal, Lyke claims: (1) the trial court erred in denying his motion to quash arrest and suppress evidence because police officers did not have a reasonable, articulable suspicion of criminal activity at the time they detained and searched him; and (2) his AUUW convictions were improperly enhanced from Class 4 to Class 2 offenses where the trial court erroneously relied upon a void conviction to enhance his sentence.

¶ 26                        A. Motion to Quash Arrest and Suppress Evidence

¶ 27      We first address Lyke's claim that the trial court erred in denying his motion to quash arrest and suppress evidence. Lyke argues the police officers did not have a reasonable, articulable suspicion of criminal activity at the time they detained and searched him. Rather, he argues the police officers' sole basis for arresting and searching him was a tip that he possessed a firearm earlier that evening—an act, which on its own, is not a crime. Accordingly, Lyke maintains that the trial court should have suppressed the firearm as unlawfully obtained evidence and this court

should therefore reverse his conviction outright because the State could not have proven him guilty beyond a reasonable doubt without evidence of the firearm.

¶ 28    In reviewing a trial court's ruling on a motion to suppress evidence, we apply the bifurcated standard of review adopted by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Johnson*, 237 Ill. 2d 81 (2010). Under this standard, we review a trial court's findings of fact only for clear error. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). "In other words, we give great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence." *Id*. Nevertheless, a reviewing court is permitted to undertake its own legal assessment of the facts and draw its own conclusions in deciding what relief should be granted. *Id*. We review *de novo* the trial court's ultimate determination on whether suppression is warranted. *Johnson*, 237 Ill. 2d at 88-89. *De novo* means we analyze the petition's claims the same as a trial court would. *People v. Parada*, 2020 IL App (1st) 161987, ¶ 18.

¶ 29    In the case at bar, Lyke has not challenged the trial court's findings of fact at the hearing on the motion to quash and suppress. Instead, Lyke contends that even if Mathis's tip was true and reliable, it was insufficient to justify his seizure because possession of a handgun outside of the home is not a crime and cannot constitute reasonable suspicion for an investigatory stop.

¶ 30    Both the Illinois Constitution (Ill. Const. 1970, art. I, §6) and the United States Constitution (U.S. Const., amend. IV) protect individuals against unreasonable searches and seizures. *People v. Holmes*, 2017 IL 120407; People *v. Spain*, 2019 IL App (1st) 163184. "The 'essential purpose' of the fourth amendment is to safeguard against arbitrary invasions by requiring that law enforcement officers exercise their discretion reasonably." *People v. Thomas*, 2019 IL App (1st) 162791, ¶ 18 (quoting *People v. McDonough*, 239 Ill. 2d 260, 266 (2010)). As such, the

fourth amendment proscribes only those searches and seizures that are unreasonable. *Thomas*, 2019 IL App (1st) 162791 at ¶ 18.

¶ 31    In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court held that a brief investigatory stop is lawful and reasonable when the totality of the circumstances reasonably leads the officer to conclude that a crime has occurred. The *Terry* court ultimately "held that when a police officer observes unusual conduct that reasonably leads him to conclude criminal activity may be afoot and the individual he is dealing with is armed and presently dangerous, the officer is permitted to stop the individual and make reasonable inquiries." *People v. Colyar*, 2013 IL 111835 (2013). The officer may conduct a pat down search, commonly referred to as a "frisk," to determine whether the individual is carrying a weapon, but the officer must be able to point to specific, articulable facts which would cause a "reasonably prudent person" to believe their safety was in danger. *People v. Hyland*, 2012 IL App (1st) 110966, ¶33.

¶ 32    As Lyke was arrested after *Aguilar* was decided, the police needed probable cause to believe, not only that Lyke possessed a gun, but that his possession was illegal. Officer Brennan testified she was informed by Mathis that Lyke had attempted, earlier in the evening, to enter the nightclub with a gun. Pursuant to the Firearm Concealed Carry Act ("the Act"), it is illegal for an individual with a CCL to "knowingly carry a firearm on or into * * * any building, real property, and parking area under the control of an establishment that serves alcohol on its premises, if more than 50% of the establishment's gross receipts within the prior 3 months is from the sale of alcohol." 430 ILCS 66/65 (West 2014). Thus, the responding officers had probable cause to believe Lyke's possession of a weapon was illegal, regardless of whether Lyke was a valid holder of a FOID card or CCL.

¶ 33   While Lyke argues there is no evidence the nightclub fell into the prohibited category detailed above, we find this argument to be tenuous at best. The evidence adduced at the suppression hearing established that the responding officers had, at a minimum, a reasonable suspicion that Lyke's attempt to enter a nightclub was an illegal act. As referenced above, the Act prohibits the carrying of a firearm into an establishment that serves alcohol on its premises. Additionally, Mathis—whose responsibility was enforcing rules of entry—denied Lyke entry after discovering that Lyke was attempting to enter the nightclub while armed with a handgun. Mathis informed the officers of this fact and therefore the officers could reasonably assume the club fell within a prohibited category for possession of handguns.

¶ 34   Lyke next contends the officers had no reasonable suspicion to detain or search him, where he had not engaged in any criminal conduct. Specifically, Lyke points out he did not enter the nightclub, but instead complied when Mathis denied him entry into the club. However, after having previously been denied entry to the nightclub, Lyke nonetheless returned to the area shortly thereafter. The fact that Lyke had not attempted to reenter the club when the police officers approached him is irrelevant, as the officers had a reasonable, articulable suspicion that Lyke was returning to the nightclub while armed. Therefore, for officer safety, the police officers were permitted to conduct a *Terry* pat down. Before so doing, the officers informed Lyke of what Mathis had told them. Lyke did not deny the interaction with Mathis occurred. Furthermore, the officers asked Lyke if he was carrying a weapon. He denied having a handgun. Lyke's denials did not stop the officers from having the right to pat him down, based upon what they had been told, for both their safety and for the safety of those in and around the nightclub. Once Lyke began resisting the pat down, Officer Bruno restrained him sufficiently to allow his fellow officers to complete the

pat down. Upon discovering the weapon, the officers had probable cause to arrest Lyke for his earlier attempt to enter the nightclub, even if he made no further attempt to reenter that night.

¶ 35        In reaching this conclusion, we have considered *People v. Bloxton*, 2020 IL App (1st) 181216, upon which Lyke relies. In *Bloxton*, police officers were on a routine patrol when they spotted a group of people standing in the street, drinking out of clear plastic cups. *Id*. at ¶ 5. As the officers approached the group, Bloxton, who was not holding a cup, began walking toward a house. *Id*. at ¶ 6. One of the officers saw a large bulge in Bloxton's pocket and, thinking it might be a firearm, followed Bloxton and asked him to stop. *Id*. According to the officer, Bloxton arrived at the porch and reached into his pocket and exposed the handle of a gun, at which point the officer had Bloxton handcuffed and the gun removed. *Id*. The police officer acknowledged he had never before seen Bloxton, did not observe him do anything illegal, did not check if Bloxton had a record or could legally possess a firearm, and that there was no warrant for Bloxton. *Id*. at ¶ 7. The trial court denied Bloxton's motion to quash arrest and suppress evidence. *Id*. at ¶ 9. On appeal, we reversed Bloxton's conviction, finding there was no reasonable suspicion to stop Bloxton when he was walking away from police officers. *Id*. at ¶ 21. We additionally held there was no probable cause to arrest defendant solely for having a gun, which no longer automatically amounts to criminal conduct. *Id*. at ¶ 21-22. Lyke avers, as in *Bloxton*, he was arrested solely because police believed he was in possession of a handgun.

¶ 36        Here, unlike in *Bloxton*, the police officers proceeded to a particular area on the basis of a nightclub bouncer's tip that a male had attempted to enter a prohibited area with a firearm. Upon Lyke's subsequent return to the nightclub area, the bouncer identified Lyke as the same individual with the weapon. In contrast, in *Bloxton*, the police had no reason to believe Bloxton was committing or had committed a crime. Prior to effectuating the *Terry* stop in this case, Officer

Brennan had information that an attempted crime had previously taken place and had reason to believe criminal activity was afoot. This critical factor distinguishes the case at bar from *Bloxton.*

¶ 37    Lyke additionally relies on *People v. Horton*, 2017 Il App (1st) 142019, *People v. Lamont Thomas*, 2016 IL App (1st) 141040, *Pinner v. State*, 74 N.E. 3d 226 (Ind. 2017), and *People v. James Thomas*, 2019 IL App (1st) 162791, in support of his contention that the mere possession of a gun outside the home does not amount to reasonable suspicion. As detailed above, the same factor—that the responding officers had reason to believe Lyke was committing or had committed a crime—readily distinguishes the instant case from these cases.

¶ 38    We find that the amalgamation of known facts and circumstances was sufficient to raise a reasonable suspicion of criminal activity to warrant the *Terry* stop in this case. As to the appropriateness of the "frisk" that followed, we observe that a police officer may pat down an individual during a *Terry* stop if the officer reasonably believes the individual is armed and dangerous. *Hyland*, 2012 IL App (1st) 110966, ¶33. Here, Officer Brennan testified that, upon Lyke's return to the nightclub area, he was identified as the individual who earlier attempted to enter the nightclub armed with a weapon. Under these circumstances, we find that the pat down search was warranted, and the removal of the gun was proper. For these reasons, we find no error by the trial court in denying Lyke's motion to quash arrest and suppress evidence.

¶ 39                        B. Enhanced Classification of Offense

¶ 40    Lyke next contends that his AUUW convictions were improperly enhanced from Class 4 to Class 2 offenses where the trial court erroneously relied upon a void conviction to enhance his sentence. He therefore requests that we vacate the trial court's order entering Class 2 AUUW convictions and order the circuit court clerk to correct his *mittimus* to reflect that he was convicted and sentenced to Class 4 AUUW convictions.

¶ 41    "It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (3rd Dist. 2007). A trial court abuses its discretion only when (1) its decision is arbitrary, fanciful, or unreasonable, or (2) no reasonable person would take the view adopted by the court. *People v. Towns*, 2020 IL App (1st) 171145.

¶ 42    To preserve a claim of sentencing error for appellate review, a defendant must both object contemporaneously and raise the issue in a post-sentencing motion. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Here, the record demonstrates that Lyke made no objection at any time during the sentencing hearing.[7] Nor did Lyke file a written post-sentencing motion. However, Lyke argues the forfeiture rule should not be rigidly applied here and—if we find the issue was not preserved— we should reach it under plain error review. When sentencing issues affect a defendant's substantial rights, they are excluded from the doctrine of waiver. *People v. Carmichael*, 343 Ill. App. 3d 855, 859 (1st Dist. 2003). Therefore, we consider this issue for plain error. *People v. Mitchell*, 2018 IL App (1st) 153355, ¶ 39.

¶ 43    Under the plain error doctrine, we may review clear and obvious errors that were unpreserved at the trial level. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545. We have previously held that a defendant's assertion that the offense of which he was convicted was improperly enhanced implicates substantial rights justifying review. *Carmichael*, 343 Ill. App. 3d at 859 (holding defendant's UUWF conviction was

---

[7] At the beginning of the sentencing hearing, defense counsel addressed the trial court and clarified that Lyke's AUUW conviction under case number 11 CR 18974 had been vacated as of January 14, 2017. Thereafter, defense counsel made a brief reference in mitigation that the State was attempting to use the vacated conviction as an underlying felony.

improperly enhanced from a Class 3 felony to a Class 2 felony). The defendant has the burden of persuasion under both prongs of the plain error doctrine. *Hillier*, 237 Ill. 2d at 545. The first step in our analysis is to determine whether there was any error. *Piatkowski*, 225 Ill. 2d at 565.

¶ 44    Lyke was charged and convicted of AUUW, which provides, in relevant part:

> "(a) A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:
> (1) Carries * * * concealed on or about his or her person except when on his or her land or in his or her abode * * * any pistol, revolver, stun gun, or taser or other firearm; and
>> A-5. the pistol, revolver, or handgun was uncased, loaded, and immediately accessible at the time of the offense and the person possessing * * * has not been issued a currently valid license under the Firearm Concealed Carry Act; or
>> C.   the person possessing the firearm has not been issued a currently valid Firearm Owner's Identification Card"

720 ILCS 5/24-1.6(a)(1)/(3)(A-5),(C) (West 2014).

¶ 45    Subsection (d) of section 24-1.6 governs the classification and sentencing for this offense and it states, in relevant part:

> "(1) Aggravated unlawful use of a weapon is a Class 4 felony * * *
>
> (3) Aggravated unlawful use of a weapon by a person who has been previously convicted of a felony in this State or another jurisdiction is a Class 2 felony for which the person shall be sentenced to a term of imprisonment of not less than 3 years and not more than 7 years * * *."

720 ILCS 5/24-1.6(d)(3) (West 2014).

¶ 46    In both count 2 and 3 of the indictment, the State announced its intention "to sentence Rodrick Lyke as a Class 2 offender in that he has been previously convicted of the offense of aggravated unlawful use of weapon under case number 11 CR 18974."

¶ 47    As aforementioned, at the outset of the sentencing hearing, defense counsel addressed the trial court and clarified that Lyke's AUUW conviction under case number 11 CR 18974 had been

vacated as of January 14, 2017. In response, the trial court explicitly made clear that it would not consider the vacated conviction "whatsoever." The State then argued in aggravation that Lyke had a prior PCS conviction, under case number 10 CR 22343. In mitigation, defense counsel, *inter alia*, briefly referenced that the State was attempting to use Lyke's vacated conviction as an underlying felony and mentioned Lyke's prior PCS conviction.

¶ 48        In sentencing Lyke, the trial court stated "[t]he other thing is, this is still a Class 2 felony. That other one may be vacated but this is a status offense. You are a convicted felon and you know you can't have guns." The court further explicated, "you had a weapon before and your lawyers were able to vacate that, per the law." In discussing the presentence investigation report, the court referenced its notes that Lyke had a prior drug case.

¶ 49        Lyke concedes that the trial court acknowledged that his prior AUUW conviction had been vacated because the statute under which that conviction was entered was void pursuant to *Aguilar*, 2013 IL 112116. However, Lyke argues that the trial court nonetheless relied upon the vacated conviction to elevate the class of the offenses for which he was sentenced. The State counters that the trial court did not rely on Lyke's vacated AUUW conviction in sentencing him, and did not need to, where Lyke had another felony conviction that was not vacated—the 2010 PCS conviction.

¶ 50        Based on the foregoing, we find that the trial court did not rely upon the vacated AUUW conviction to enhance Lyke's AUUW convictions to Class 2 felonies. Rather, the trial court relied upon Lyke's other prior felony conviction to support the enhancement of his AUUW convictions.

¶ 51        The State argues the trial court did not err where it was statutorily required to sentence Lyke for Class 2 felonies based upon his previous PCS felony conviction. In reply to the State's argument, Lyke contends that allowing the State to utilize a different prior felony to support the

enhancement of his AUUW convictions would violate the notice requirement, as required by the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(c) (West 2014).

¶ 52    Whether the State's charging instrument failed to provide the notice required by the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(c) (West 2014)) is a question of statutory interpretation, which this court reviews *de novo. People v. Caballero*, 228 Ill. 2d 79, 82 (2008).

¶ 53    When we interpret a statute, our primary objective is to ascertain and give effect to the legislature's intent. *Hernandez v. Lifeline Ambulance, LLC*, 2020 IL 124610. The best indication of the legislature's intent is the plain language of the statute itself. *Id.* When the language of the statute is clear and unambiguous, we must apply it as written. *Id.*

¶ 54    According to well-established principles of statutory interpretation, we must construe a statute so that all the language used in the statute is given effect and so that no word, clause, or sentence is "rendered meaningless, superfluous or insignificant." (Internal quotation marks omitted.) *People v. Jones*, 397 Ill. App. 3d 651, 657 (1st Dist. 2009). *See also Blum v. Kostner*, 235 Ill. 2d 21, 44 (2009) ("we construe the statute to avoid rendering any part meaningless or superfluous"); *Crawford supply Co. v. Schwartz*, 396 Ill. App. 3d 111, 117 (1st Dist. 2009).

¶ 55    Section 111-3 is entitled "Form of charge" and it mandates what information a charging instrument must state. Specifically, subsection (c) requires, in relevant part:

> "When the State seeks an enhanced sentence because of a prior conviction, the charge shall also state the intention to seek an enhanced sentence and shall state such prior conviction so as to give notice to the defendant. * * * For purposes of this section, 'enhanced sentence' means a sentence which is increased by a prior conviction from one classification of offense to another higher level classification of offense * * *; it does not include an increase in the sentence applied within the same level of classification of offense."

725 ILCS 5/111-3(c) (West 2014).

¶ 56 Section (c) provides that the charge shall "state the intention to seek an enhanced sentence *and* shall state such prior conviction." 725 ILCS 5/111-3(c) (West 2014) (emphasis added). As indicated by the "and" in this sentence, both are required. To interpret the statute in any other manner would be to render the word meaningless and insignificant, which we must not do. See *Jones*, 397 Ill. App. 3d at 657.

¶ 57 In *People v. Jameson*, 162 Ill. 2d 282 (1994), the Illinois Supreme Court reviewed and analyzed the legislative history behind section 111-3(c). In so doing, the Court articulated:

> "When the language of section 111-3(c) is considered in light of the legislative history of that statute, it is evident that the legislature intended that statute to reach those instances in which a prior conviction elevates the classification of the *offense* with which a defendant is charged and convicted , rather than simply the sentence imposed."

*Jameson*, 162 Ill. 2d at 288 (emphasis in original).

¶ 58 The Illinois Supreme Court further analyzed section 111-3(c) in *People v. Easley* and held that "in construing the language of section 111-3(c), it is clear that the notice provision applies only when the prior conviction that would enhance the sentence is not already an element of the offense." 2014 IL 115581, ¶ 19 (holding the State was not required to provide defendant notice of intent to enhance sentence based on prior conviction for unlawful use of a weapon by a felon, where said prior conviction is a necessary element of the offense).

¶ 59 A prior conviction is not a necessary element for the offense of aggravated unlawful use of a weapon. Therefore, contrary to *Easley*, the State was required to give notice in the indictment of its intention to enhance Lyke's sentence based on his prior PCS conviction. See *In re Dave L.*, 2017 IL App (1st) 170152, ¶ 26 ("Thus, notice under section 111-3(c) would have been required if respondent had been tried as an adult for AUUW where the State sought to enhance his sentence to a Class 2 felony based on his prior AUUW convictions.")

¶ 60        In the instant case, there is no dispute that the State, at sentencing, sought "an enhanced sentence because of a prior conviction." In fact, Lyke's sentence was "increased by a prior conviction from one classification of offense, to another higher level classification of offense." 725 ILCS 5/111-3(c) (West 2014). Namely, from a Class 4 offense to a Class 2 offense. In keeping with the notice requirements of section 111-3, as detailed above, both count 2 and 3 of Lyke's indictment announced the State's intention "to sentence Rodrick Lyke as a Class 2 offender."

¶ 61        However, section (c) also requires that the charging instrument state *which* prior conviction is serving as the basis of the enhancement. 725 ILCS 5/111-3(c) (West 2014) (emphasis added). Here, the State included in the indictment its intent to sentence Lyke as a Class 2 offender based upon his previous conviction "of aggravated unlawful use of weapon under case number 11 CR 18974." As noted at Lyke's sentencing hearing, Lyke's conviction under case number 11 CR 18974 was vacated pursuant to *Aguilar*, 2013 IL 112116. As the former AUUW conviction is void *ab initio*, it could not be used by the State to enhance Lyke's instant convictions. Furthermore, it cannot be said the State gave proper notice pursuant to section 111-3(c), where the State effectively failed to "state such prior conviction so as to give notice to the defendant."

¶ 62        For these reasons, we find Lyke's conviction was improperly enhanced when the State failed to give proper notice of a prior conviction in the charging document.

¶ 63                        IV. CONCLUSION

¶ 64        Based on the foregoing, we affirm Lyke's convictions for aggravated unlawful use of a weapon, vacate Lyke's sentence, and remand for resentencing as a Class 4 felony.

¶ 65    Affirmed in part and reversed in part.

¶ 66    Cause remanded.